UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 08-69940

WHYCO FINISHING TECHNOLOGY, LLC,                Chapter 11

              Debtor.                           Judge Thomas J. Tucker

_____/

FRANKLIN ADVISORS, LLC, etc.,

              Plaintiff,

v.                                              Adv. Pro. No. 10-6850

SHERWOOD MANAGEMENT CORP.,

              Defendant.

_____/

**OPINION REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This adversary proceeding came before the Court for a hearing on the Plaintiff's motion

for summary judgment.[1]  For the reasons stated in this opinion, the Court will deny the Motion.

**I. Background and facts**

   **A. Introduction**

The related Chapter 11 case of Whyco Finishing Technology, LLC ("Whyco") is being

administered under a confirmed plan of liquidation (the "Confirmed Plan").[2]  The Plaintiff in this

---

[1]  "Trustee's Motion for Summary Judgment and Disallowance of Sherwood's Claims" (Docket
# 29, the "Motion").

[2]  The Confirmed Plan is entitled "Official Committee of Unsecured Creditors' Fifth Amended
Combined Liquidating Plan of Reorganization and Disclosure Statement" (Docket # 352 in Case No. 08-
69940 (the "Main Case")).  It was filed on January 26, 2010, and then was supplemented by the filing of
a Liquidation Trust Agreement, filed on March 19, 2010 (Docket # 377 in Main Case).  It was confirmed,
with modifications, by the order filed on March 22, 2010 (Docket # 380 in Main Case).

adversary proceeding, Franklin Advisors, LLC ("Plaintiff" or "Franklin"), is the Liquidation

Trustee under the Confirmed Plan. The Defendant, Sherwood Management Corporation

("Defendant" or "Sherwood"), is an unsecured creditor who filed a proof of claim and an

amended proof of claim in the *Whyco* case. Sherwood's amended claim is for $710,489.71, and

is based on the Debtor Whyco's alleged breach of a real estate lease.

Franklin's complaint in this adversary proceeding seeks disallowance, or in the

alternative, a reduction, of Sherwood's claim. The complaint seeks this relief for a variety of

reasons, some of which are discussed in this opinion, including Franklin's argument that neither

Sherwood's initial proof of claim nor its amended proof of claim was timely filed.

This dispute began as an objection to claim, filed in the Main Case by the Official

Committee of Unsecured Creditors, which raised most of the same arguments now being made

by Franklin in this adversary proceeding.[3] Under the Confirmed Plan, both Franklin, as

Liquidation Trustee, and the Committee have authority to object to claims.[4] Franklin filed its

claim objection as an adversary proceeding, because it includes an alternative theory of claim

objection involving the avoidance of an alleged fraudulent transfer. The Committee's objection

to claim remains pending in the Main Case, awaiting the Court's ruling on the pending motions

in this adversary proceeding.[5]

### B. Sherwood's claim and amended claim

---

[3] *See* "The Official Committee of Unsecured Creditors' Objection to Amended Claim of Sherwood Management Corp. [Claim No. 48-2]" (Docket # 425 in Main Case).

[4] *See* Confirmed Plan (Docket # 352) at 16, 19. And the Committee is to supervise the activities of the Liquidation Trustee. *See id.* at 18.

[5] *See* Order (Docket # 531 in Main Case).

## 1. The Lease between Whyco and Sherwood

Except as otherwise noted, the following facts are undisputed. On or about September 27, 2003, the Debtor Whyco and Sherwood entered into a written lease agreement dated September 3, 2003, under which Sherwood leased to Whyco real property located at 18074 Sherwood, Detroit, Michigan (the "Premises").[6] The initial term of the Lease was for five years, and ran from February 1, 2004 through January 31, 2009. The Lease gave Whyco an option to renew the Lease after the initial 5-year term, for five additional one-year periods. Whyco's renewal of the Lease for each of these additional one-year periods was automatic, unless Whyco gave a 180-day written notice to Sherwood. The Lease provided that:

> Unless the LESSEE provides the LESSOR written notice One Hundred Eighty (180) days prior to a renewal period, this LEASE will automatically extend in one (1) year increments after the INITIAL PERIOD. During any occupancy after the INITIAL PERIOD, all the same terms and conditions as set forth in this LEASE shall apply, except the rent during any month will be Five hundred Dollars ($500.00) more than the corresponding month (12) months prior.[7]

One of Whyco's subsidiaries, Whyco Detroit, LLC ("Whyco Detroit"), which is a successor to Spartan Plating Company ("Spartan"), occupied the Premises during the initial 5-year term, and operated a metal finishing business there. Whyco itself never occupied the Premises.[8]

Franklin alleges, but Sherwood disputes, that effective October 1, 2003, Whyco assigned

---

[6] A copy of this written lease (the "Lease") appears in Exhibit 6-A of Franklin's Motion (Docket # 29).

[7] Lease ¶ 2.0.

[8] Decl. of William Aiken (Ex. 5-A of Docket # 29) at ¶ 8.

3

to its subsidiary, then known as Spartan, its interest in the Lease, with Spartan agreeing to assume all of Whyco's obligations under the Lease.  Franklin alleges, but Sherwood disputes, that Sherwood consented to this assignment of the Lease, through the signature of Joel Weingrad, Sherwood's President.[9]

### 2.  Whyco's bankruptcy case and Sherwood's claim

Whyco filed its Chapter 11 bankruptcy petition on December 8, 2008.  Sherwood was not listed as a creditor on Whyco's schedules, and Sherwood was not given any notice of Whyco's bankruptcy filing.  The Court set a deadline of April 13, 2009 for creditors to file proofs of claim in the *Whyco* case.  Sherwood did not file any proof of claim by the deadline.

Sherwood's President, Joel Weingrad, has admitted that he became aware of Whyco's bankruptcy filing in "March or April" 2009.[10]  While the evidence does not pinpoint more exactly when in March or April 2009 Sherwood first learned of the Whyco bankruptcy, it is clear that Sherwood had actual knowledge of the bankruptcy case no later than April 23, 2009.  That is the date on which Sherwood filed a lawsuit in the Wayne County, Michigan Circuit Court against Whyco's William Aikens ("Bill Aikens"), seeking to recover based on Aikens's personal guarantee of the Lease.  In paragraph 15 of its complaint, Sherwood alleged that "[u]pon information and belief, Whyco has filed for protection under the United States Bankruptcy Code."[11]

Almost three months later, on July 16, 2009, Sherwood filed its initial proof of claim in

---

[9]  *See* discussion in part IV.B of this opinion.

[10]  Dep. of Joel Weingrad (Docket # 29, Ex. 5-B) at 67-68.

[11]  Docket # 29, Ex. 6-G at ¶ 15.

4

the *Whyco* bankruptcy case, in the amount of $202,878.12.[12]  Nine months after that, Sherwood

filed its amended proof of claim, in the amount of $710,489.71, on April 21, 2010.[13]  This was

just over a month after the Court entered its March 22, 2010 Order confirming Whyco's Chapter

11 Plan.

## II.  Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C.

§§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  This is a core

proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O).[14]

This proceeding also is "core" because it falls within the definition of a proceeding

"arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning

of 28 U.S.C. § 1334(b).  Matters falling within either of these categories in § 1334(b) are deemed

to be core proceedings.  *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27

(Bankr. E.D. Mich. 2009).  This is a proceeding "arising under title 11" because it is "created or

determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code §§ 502(a)

and (b), 365, and 548.  And this is a proceeding "arising in" a case under title 11, because it is a

proceeding that "by [its] very nature, could arise only in bankruptcy cases."  *See id.* at 27.

## III.  Summary judgment standards

Fed.R.Civ.P. 56(a), applicable to bankruptcy adversary proceedings under Fed.R.Bankr.P.

---

[12] Docket # 29, Ex. 6-H.

[13] Docket # 29, Ex. 6-I.

[14] The parties have agreed that this is a core proceeding.  *See* Report of Parties' Rule 26(f)
Conference (Docket # 13) at 3.

7056, provides that a motion for summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149-50 (6th Cir. 1995), the court elaborated:

> The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up" on a critical issue.

> If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a . . . verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.
> . . .

> Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson [v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)], *Celotex [Corp. v. Catrett*, 477 U.S. 317 (1986)] and *Matsushita [Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)], trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion

6

should be granted.

*Id.* (internal quotation marks and citations omitted). In determining whether the moving party

has met its burden, a court must "believe the evidence of the nonmovant, and draw all justifiable

inferences in favor of the nonmovant." *Ingram v. City of Columbus*, 185 F.3d 579, 586 (6th Cir.

1999)(relying on *Russo v. City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir.1992)).

**IV. Discussion of Franklin's summary judgment arguments**

The Court will now discuss Franklin's summary judgment arguments.

**A. Franklin's argument that the Lease terminated on January 31, 2009**

Franklin asks the Court to rule, among other things, that the Lease between Whyco and

Sherwood terminated at the end of the initial 5-year term, on January 31, 2009. Franklin claims

that Whyco gave Sherwood the 180-day prior written notice of non-renewal, required by the

Lease in order to avoid an automatic one-year renewal of the Lease. Sherwood disputes this, and

contends that the Lease automatically renewed for an additional one-year period when the initial

5-year Lease term ended on January 31, 2009.

Under ¶ 2.0 of the Lease, quoted in part I.B of this opinion, Whyco had to provide

Sherwood "written notice" at least 180 days before the January 31, 2009 expiration of the initial

5-year Lease term, in order for the Lease to terminate on that date. Otherwise, by its terms, the

Lease automatically renewed for an additional one-year period, on the same terms, except at a

rental rate of $500.00 per month higher than during the last year of the initial 5-year term. The

180-day notice deadline was August 4, 2008.

Franklin contends that Whyco timely gave the required written notice to Sherwood on

two different occasions — first, in a letter addressed to Joel Weingrad dated March 20, 2008; and

second, in an e-mail to Joel Weingrad on July 31, 2008. Sherwood disputes that either of these writings constitutes a notice sufficient to avoid the automatic one-year renewal of the Lease on January 31, 2009.

### 1. The March 20, 2008 letter

The one-page March 20, 2008 letter, at the top of the page, had the letterhead of Whyco's subsidiary, Whyco Detroit, the occupant of the Premises, and was signed by W. Nicholas ("Nick") Post, Whyco Detroit's President. At the bottom of the stationery used for this letter was the name "The Whyco Group" and a list of four business locations, including "Detroit, MI." The letter states the following:

> March 20, 2008
>
> Joel Weingrad
>
> Re: 18074 Sherwood Lease
>
> Dear Joel,
>
> **The first 5 years of our lease agreement covering 18074 Sherwood will be ending at the end of September 2008.** Although we have been generally pleased with the building and location, due to the changes in the economic climate of Michigan and the Detroit area in particular **the increase in rent listed in Exhibit B of the lease is not acceptable**.
>
> We hired an independent appraiser to have a better idea of current commercial rents in the Detroit area. Based on his reports information Whyco should be paying $7,800/month rent ($3.04 X 30,906 / 12) not $12,400 let alone [an] increase. Additionally this is an assessment based on information that is trailing current real estate market conditions; the actual market is lower than the numbers above and headed down.
>
> **We would like to open a discussion with you to re-examine the rent following this initial 5-year period in the hope of lowering**

8

**the rent and remaining in the building. If you feel this is not possible, I would appreciate it if you would let me know and in that event you may consider this letter your 180-day notice (per the lease agreement) that we will be forced to vacate 18074 Sherwood by the end of September.**[15]

The writer of this letter assumed, mistakenly, that the initial 5-year term of the Lease ended in September 2008. As noted earlier in this opinion, however, the parties agree that the initial 5-year term actually ended on January 31, 2009.

Sherwood's President, Joel Weingrad, received this letter no later than March 24, 2008. On that date, he sent Whyco Detroit's Nick Post an e-mail acknowledging receipt of the letter, and stating, in pertinent part, the following:

> Nick
>
> I have received your letter of March 20, 2008 to Joel Weingrad, Re: 18074 Sherwood Lease, and wish to reply completely and immediately. If you would please scan the signed lease, and any modifications you have, and forward it to me by email, I will reply quickly. I will review the lease, as modifed, and send you a proposal with a rental rate less than your present monthly rental for any renewal periods. Further explanation below.
>
> We want to be responsive to the prevailing rental market. We would like to keep you as a tenant. Bill was very helpful at the inception of the lease and I provided some guidance to Bill for the purchase of the equipment installed. I had anticipated Bill would purchase the building at some later date. Our objective is to sell the property.[16]

After this exchange, the parties discussed possible terms on which they might agree to extend the Lease beyond the January 31, 2009 expiration date, but they came to no agreement.

---

[15] Ex. 6-D at Docket # 29 (emphasis added).

[16] Ex. 6-E at Docket # 29.

9

Ultimately, on July 31, 2008, Whyco and Sherwood exchanged the following e-mails. First,

Sherwood's Joel Weingrad sent the following e-mail to Nick Post of Whyco Detroit and

Whyco's Bill Aikens, at 11:13 a.m.:

> BILL
> NICK
>
> I SPOKE WITH MARY THIS MORNING AND ASKED THAT
> ONE OF YOU CALL ME AT 734 418 2387. A CALL IS NOT
> REQUIRED
>
> IF THE "LEASE MODIFICATION OF THE 25 JULY 2008" IS
> ACCEPTABLE. JUST SIGN IT AND SEND IT BY EMAIL TO
> ME.
>
> THE PURPOSE OF HAVING YOU CALL WAS TO EXPEDITE
> A LEASE EXTENSION. AS THE 180 DAY PERIOD PRIOR TO
> THE END OF THE FIRST LEASE PERIOD IS APPROACHING,
> I HAVE TO ENGAGE A REAL ESTATE BROKER AND HAVE
> A SIGN PLACED ON THE PROPERTY, IF THE OCCUPANCY
> IS TERMINATING JANUARY 31, 2009. A "FOR SALE OR
> LEASE" SIGN IS NOT GOOD FOR YOU IF YOU HAVE
> CUSTOMERS VISITING.
>
> FURTHERMORE, I WOULD NOT LIKE TO HAVE ANY
> CONFUSION AS TO THE STATUS OF THE LEASE. I PREFER
> TO WORK WITH A CLEARLY WRITTEN AGREEMENT. BY
> NOT SIGNING A MODIFICATION AT THIS TIME, I CAN
> ONLY ASSUME THE ORIGINAL PROPERTY LEASE IS STILL
> EFFECTIVE AND GOVERNING.
>
> JOEL 31 JULY 2008[17]

About two hours later, at 1:20 p.m., Whyco's Bill Aikens replied to Joel Weingrad's e-

mail with the following e-mail:

> Joel, we are presently negotiating to obtain an extension of a major
> contract which would be essential for us to be able to remain in the

---

[17] Ex. 6-F of Docket # 29.

10

building. Our customer told us that they will be unable to give us the answer until September 30, so we are unable to determine if we will be able to extend prior to receiving their answer.

Bill[18]

Franklin argues that Nick Post's March 20, 2008 letter, quoted above, clearly communicated to Sherwood that the Lease would not automatically renew at the end of the five-year term on January 31, 2009. This is so, Franklin argues, because the letter clearly stated that after the five-year term ended, Whyco would not continue to lease the Premises at the rental rate provided in the Lease; but rather would remain in the Premises only if the parties could agree on a substantially reduced rental rate. According to Franklin, this message to Sherwood was clearly inconsistent with allowing the Lease to automatically renew on January 31, 2009 for another year, at the (increased) rental rate provided in the Lease.

Sherwood argues, on the other hand, that Nick Post's March 20 letter was at most a *conditional* notice of non-renewal of the Lease, and that the conditions for non-renewal did not occur. Sherwood put it this way in its brief:

> By its terms in order to stand as notice two conditions had to occur before the letter would act to satisfy the terms of Paragraph 2.0 to not automatically renew the Lease:
>
> 1. Sherwood would have to refuse to discuss lowering the rent; and
> 2. Sherwood would have to let Whyco know that it would be unwilling to discuss a reduction.
>
> These conditions were never met, therefore, the conditional notice is void. On March 24, 2008, Joel Weingrad on behalf of Sherwood sent an e-mail to Nick Post in response to the letter to open a dialogue and indicate that he was willing to discuss altering the

---

[18] *Id.*

11

rent. (Exhibit F, *E-Mail dated 3/24/2008*). Upon receipt of this
letter the conditions for the March 20, 2008 letter to constitute
notice failed. Thus, the letter fails to constitute notice under
Paragraph 2.0 and prevent automatic renewal.[19]

Based on the undisputed facts, the Court finds that the March 20 letter was *not* a notice of

non-renewal that was sufficient to avoid the automatic one-year renewal of the Lease. While at

first blush the March 20 letter may appear to be ambiguous,[20] a closer reading leaves only one

reasonable interpretation on the material issue, as the Court will now explain.

At first glance, one might read the letter to mean that Whyco would not allow the Lease

to automatically renew at the end of the five-year term on January 31, 2009, because Whyco

found the increased rent that would apply under such an automatic renewal to be unacceptable.

One might read the March 20 letter to mean that Whyco would continue to lease the Premises

after the initial five-year term ended only if the parties could agree on a substantially reduced

rental rate. And that, of course, is clearly inconsistent with the notion of the Lease automatically

renewing for a year, which would necessarily mean Whyco paying the higher renewal rental rate

stated in the Lease.

On a closer reading, however, the March 20 letter can only reasonably be read to *also*

mean that, despite whatever else Whyco stated in the letter, Whyco did *not* intend the letter to be

its 180-day notice of non-renewal of the Lease, *unless* two conditions were met; namely that:

(1) it was not possible for Sherwood to agree to lower the rent after the initial five-year

---

[19] Sherwood Br. (Docket # 33) at 13.

[20] During oral argument, counsel for Franklin and counsel for Sherwood each stated that the
March 20 letter is ambiguous. (*See* Tr. (Docket # 48) at 55-56, 63 line 18.) As explained below,
however, the Court concludes that the March 20 letter is ambiguous only in a way that does not matter
(*i.e.*, regarding which of two possible alternatives for "Condition 1" is meant in the letter.)

term; or it was not possible for Sherwood to discuss with Whyco lowering the rent (as to which of these two alternatives the first condition was, the letter was ambiguous, but it was one of them)("Condition 1");[21]

and

(2) Sherwood's Joel Weingrad let Whyco's Nick Post know that Condition 1 was the case ("Condition 2").

The undisputed facts show that neither of these conditions were met. Joel Weingrad's prompt e-mail response of March 24, 2008 to the March 20 letter, quoted above, clearly stated Sherwood's willingness to discuss a lower rental rate, and it is undisputed that Whyco and Sherwood did discuss the possibility of a lower rental rate, and that as late as July 31, 2008, Sherwood proposed to Whyco a modification to the Lease. While the parties ultimately did not agree on a modification to the Lease, Franklin does not allege, and has presented no evidence, that Sherwood ever expressed to Whyco that it was not possible to agree to a lower rental rate, or that Sherwood was unwilling to discuss that subject.

For these reasons, neither of the non-renewal conditions in the March 20 letter were met. As a result, under the words that Whyco chose to use in its March 20 letter, that letter cannot reasonably be interpreted to be, in and of itself, a notice of non-renewal of the Lease.

Instead, the Court finds that the most favorable interpretation of the March 20 letter for Franklin that is reasonable is this: that Whyco was warning or threatening Sherwood that even if Sherwood *was* willing to discuss a reduction in rent for the period after the initial five-year Lease

---

[21]  Thus, the Court finds the March 20 letter to be ambiguous in this limited respect. But this ambiguity does not matter, because whichever alternative meaning applies as Condition 1, it is undisputed that Condition 1 was not met, as explained below.

term, if Whyco was unable to agree with Sherwood on a lower rental rate, Whyco would *in the future* give a notice of non-renewal, and then would leave the Premises when the initial five-year term ended. (At the time of the March 20 letter, Whyco still had some four and one-half months before the 180-day notice deadline of August 4, 2008 would pass.) But Whyco chose its words in the March 20 letter to clearly indicate to Sherwood that this letter was not itself a notice of non-renewal of the Lease unless Sherwood simply would not even consider agreeing to a lower rental rate for the Premises.

For these reasons, the Court finds that, based on the undisputed facts, the March 20 letter unambiguously was *not* itself a notice of non-renewal of the Lease. That letter clearly did not suffice to avoid the automatic one-year renewal of the Lease when the initial five-year term expired on January 31, 2009.

### 2. The July 31, 2008 e-mail

Franklin argues that the July 31, 2008 e-mail from Whyco's Bill Aikens to Sherwood's Joel Weingrad, quoted above, also was a sufficient written notice of non-renewal of the Lease. But it clearly was not. In that e-mail, Whyco merely stated that at that time, Whyco was unable to determine whether it would be able to extend the Lease beyond the initial five-year term. Rather, Whyco indicated, it had to wait until at least September 30, 2008 to make a decision, because it would be waiting until then to learn whether one of its customers was extending a major contract. September 30, of course, was well after the August 4, 2008 deadline for a 180-day written notice of non-renewal.

Whyco points to no other writing that it claims was a written notice of non-renewal of the Lease given to Sherwood before the August 4, 2008 deadline.

14

For these reasons, to the extent Franklin's Motion seeks a ruling that the Lease terminated on January 31, 2009, the Court must deny the Motion. To the contrary, the evidence presently in the record demonstrates that the Lease automatically renewed for an additional year.

**B. Franklin's argument that Whyco's obligations under the Lease were assumed by Whyco's subsidiary, then known as Spartan**

As noted in part I.B.1 of this opinion, Franklin contends that effective October 1, 2003, Whyco assigned to its subsidiary, then known as Spartan, its interest in the Lease, with Spartan agreeing to assume all of Whyco's obligations under the Lease. Franklin claims that Sherwood expressly consented to this assignment of the Lease, through the signature of Joel Weingrad.

A copy of the alleged "Assignment and Assumption Agreement" is attached to Franklin's Motion as Exhibit 6-B. The affidavits and other evidence filed by the parties present conflicting evidence regarding whether this alleged assignment of the Lease ever occurred, and whether Sherwood's Joel Weingrad actually signed the purported written consent to this assignment. For one thing, Joel Weingrad's affidavit denies that he ever signed or authorized the alleged Assignment and Assumption Agreement.[22]

Sherwood has presented evidence that creates a genuine issue of material fact with respect to whether Sherwood consented to this assignment. In addition, Sherwood correctly points out that while the purported assignment document says that Spartan "agrees to assume all obligations of the Lessee [Whyco] under said lease," it does not say that the Lessee Whyco was released from any of its obligations under the Lease.

---

[22] *Compare* Decl. of Bill Aikens (Ex. 5-A of Docket # 29) at ¶¶ 12-14 *with* Aff. of Joel Weingrad (Ex. K of Docket # 33) at ¶¶ 1-3 (denying that he ever signed or authorized the alleged Assignment and Assumption Agreement).

These points are important, in part, because Paragraph 16 of the Lease says (1) that
Whyco could not assign the Lease without Sherwood's "express written consent;" and (2) that in
the event of an assignment of the Lease, Whyco "remains liable for all of the PAYMENTS
required under the terms of this LEASE, and for the performance of all covenants herein to be
performed by [Whyco]."[23]

Franklin has presented an e-mail dated February 10, 2005 in support of its assignment
argument, but that evidence actually undercuts Franklin's argument. In that e-mail, from
Sherwood's Joel Weingrad to Spartan's (later known as Whyco Detroit's) Nick Post, Sherwood
is discussing a possible assignment of the Lease. He asks "[w]hat date do you want the
assignment to be effective - January 2006?" He then notes that "[t]here are provisions in the
Lease for assignment. I think it states, Whyco assigns the lease to Spartan, and in the event of a
default, Whyco will guarantee Spartan's performance. I do not have the lease with me. This
wording should be checked for Whyco's purposes. . . ." He then discusses the possibility of
signing or confirming an assignment "later this month."[24]

In this February 10, 2005 e-mail, Joel Weingrad was mistaken in thinking that the Lease
had in it language assigning the Lease from Whyco to Spartan; the Lease has no such language.
But the fact that the parties were discussing the possibility of Whyco assigning the Lease to

---

[23] Docket # 29, Ex. 6-A at ¶ 16. As Franklin points out, in his deposition, Sherwood's Joel
Weingrad testified, in referring to this last-quoted language from Paragraph 17 of the Lease, when asked
whether "that last sentence only applied if there was an unconsented to assignment," by answering
"Essentially, yeah." (Docket # 29, Ex 5-B, Tr. at 136). But at most, this creates an issue of fact on this
point, because the Lease language on this point, quoted in the text above, is clear and unambiguous in
meaning that even in the event of a consented-to assignment of the Lease, the Lessee (Whyco) remains
liable for all payments required under the Lease.

[24] Docket # 29, Ex. 6-K at 1.

Spartan in February 2005 tends to show that the parties had *not* agreed to an assignment of the Lease in October 2003, as Franklin claims. And while Joel Weingrad's February 10, 2005 e-mail suggests that he might then have been agreeable to an assignment, his e-mail also indicates that he had in mind an assignment in which Whyco remained liable for all of its payment obligations and other obligations under the Lease. And Franklin has presented no evidence that after this February 10, 2005 e-mail, Joel Weingrad ever signed any document consenting to an assignment of the Lease, or releasing Whyco as an obligor under the Lease.

Finally, Franklin argues that Sherwood is "barred from contesting the assignment, because it was deemed to have admitted that it signed the Lease Assignment when it failed to timely respond to a request for admission on this subject."[25] Although it does not say so, Franklin must be referring to its Requests to Admit Nos. 16 and 17, which ask for admissions that Joel Weingrad signed the alleged assignment document at issue. Sherwood did respond to the admission requests, and denied Nos. 16 and 17, saying "Deny. The signature is a forgery. Further, Joel Weingrad was unaware of the existence of said document until the [Claim] Objection was filed on May 28, 2010."[26] According to Franklin, Sherwood served its responses to the admission requests 8 days late — *i.e.* 8 days after the extended deadline agreed to by the parties.[27] The Court will not deem the admission requests to be admitted by Sherwood because of this relatively minor untimeliness in responding. Instead, the Court will deem Sherwood's opposition to Franklin's Motion, and in particular Sherwood's arguments in opposition to

---

[25] Franklin Br. (Docket # 29) at 12.

[26] Docket # 35, Ex. 6-A at 49.

[27] *See* Franklin Br. (Docket # 35) at 2-4.

17

Franklin's arguments about the Lease assignment, to be an informal motion under Fed.R.Civ.P. 36(b), Fed.R.Bankr.P. 7036, to permit withdrawal or amendment of any deemed admissions under Civil Rule 36(b), and the Court now grants such motion.[28]

Based on the present record, the Court concludes that at a minimum, genuine issues of material fact preclude the granting of summary judgment to Franklin based on its assignment argument.

### C. Franklin's argument that *if* the Lease was automatically renewed for a year when the initial five-year lease term expired on January 31, 2009, such renewal is avoidable as constructively fraudulent

As an alternative argument, Franklin contends that *if* the Lease was automatically renewed for a year when the initial five-year lease term expired on January 31, 2009, the obligation imposed on Whyco by such renewal is avoidable as constructively fraudulent, under 11 U.S.C. § 548(a)(1)(B). That section states, in pertinent part:

> (a)(1) **The trustee may avoid** any transfer . . . of an interest of the debtor in property, or **any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor** voluntarily or involuntarily -
> . . .
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(Emphasis added).

Franklin's theory is that if the Lease automatically renewed for an additional year, any

---

[28]  The Court finds, under Civil Rule 36(b), that this relief "would promote the presentation of the merits of the action" and "the court is not persuaded that it would prejudice the requesting party in maintaining . . . the action on the merits."

obligation that the Debtor Whyco incurred because of that additional year being added to the Lease term was incurred on August 5, 2008 (the day after the 180-day non-renewal deadline expired), roughly four months before Whyco filed its bankruptcy petition on December 8, 2008, and that Whyco was insolvent at the time. Franklin further argues that Whyco received no benefit in exchange for incurring this obligation, and therefore did not receive "reasonably equivalent value" for the renewal obligation.

Sherwood does not dispute Franklin's evidence of Whyco's insolvency,[29] but does dispute Franklin's claim that Whyco received no value for the Lease renewal. As discussed below, the evidence on this point is conflicting.

The Court concludes that it cannot grant summary judgment for Franklin based on this avoidance theory, for the following reasons. First, under the circumstances, the alternative nature of Franklin's avoidance theory precludes summary judgment, on the present record. While it does appear that the Lease was automatically renewed for an additional year, as discussed in part VI.A of this opinion, the Court has ruled that there is a genuine issue of fact regarding Franklin's argument that Whyco was relieved of all obligations under the Lease when it allegedly was assumed by Whyco's subsidiary Whyco Detroit (then known as Spartan). *See* part IV.B, above. If Franklin ultimately prevails on that argument, that would mean that the Debtor Whyco did not incur *any* obligation when the Lease was automatically renewed for an additional year. Under the present circumstances, therefore, Franklin cannot establish one of the necessary elements to obtain summary judgment on its avoidance theory — namely, that the Debtor Whyco "incurred" an "obligation," within the meaning of § 548(a)(1), when the Lease was automatically renewed

---

[29] *See* Decl. of Bill Aikens (Ex. 5-A of Docket # 29) at ¶¶ 32-34.

for an additional year.

Second, even assuming that the Debtor Whyco did incur an obligation on August 5, 2008 when the Lease was automatically renewed for a year, there are genuine issues of fact regarding whether the Debtor Whyco received "reasonably equivalent value" in exchange for that obligation. Franklin's argument is based on the facts that only Whyco's wholly-owned subsidiary, Whyco Detroit (fka Spartan), ever occupied the Premises under the Lease, and that Whyco Detroit had vacated the Premises sometime before the expiration of the initial five-year term on January 31, 2009.[30] From these claimed facts, Franklin contends that (1) Whyco never benefitted from Whyco Detroit's use and possession of the Premises, even before the renewal year began on February 1, 2009; and (2) even if there had been some benefit to Whyco from Whyco Detroit's use and possession of the Premises, Whyco received no such benefit for any part of the renewal year of the Lease.

Sherwood does not dispute that only Whyco's subsidiary Whyco Detroit ever occupied the Premises, but Sherwood contends that Whyco benefitted from its subsidiary's use and occupancy of the Premises. And Sherwood disputes Franklin's assertion that Whyco Detroit had vacated the Premises before the Lease renewal year began on February 1, 2009. As to the latter point, Sherwood cites the affidavit of Joel Weingrad, in which he says that on two specific dates in January 2009 and on three specific dates in February 2009, he called Whyco "to discuss its tardiness in complying with the requirements of" the Lease. Each time, he spoke to Whyco's employee Mary Konopka, who told him that "although receivables were slow and volume down,

---

[30] These facts are supported by the Affidavit of Bill Aikens (Ex. 5-A of Docket # 29) at ¶¶ 8-9, and 27, and also by Mr. Aikens's deposition testimony (Ex. G of Docket # 33 at 10-11).

operations were continuing" at the Premises. Joel Weingrad also says in his affidavit that in these February 2009 phone calls Ms. Konopka "did not mention the bankruptcy," and that "facsimile communications were still being received at" the Premises.[31]

This evidence creates a genuine issue of fact regarding whether Whyco's subsidiary, Whyco Detroit, continued to occupy and use the Premises after the automatic lease renewal would have begun on February 1, 2009.

Next, the Court will address Franklin's argument that Whyco received no benefit from the renewal of the Lease even if Whyco's subsidiary, Whyco Detroit, did continue to occupy and use the Premises after January 31, 2009. As to that argument, genuine issues of material fact exist, on two levels.

First, if Whyco incurred an obligation by virtue of the automatic one-year renewal of the Lease on August 5, 2008, Whyco received in exchange for such obligation all the rights given by the Lease to the Lessee associated with that one-year renewal. If, as of August 5, 2008, the Lease was a marketable asset — *e.g.*, if Whyco could have sold (assigned) its rights under the renewed Lease to a third party for even $1.00, and Sherwood would have consented to such assignment and to a release of Whyco's liability under the lease — that would mean that the rights Whyco received under the renewed Lease had a value equal to or exceeding Whyco's obligations associated with its automatic one-year renewal of the Lease. In that event, Whyco would have received at least "reasonably equivalent value" for the Lease renewal.

The evidence presently in the record does not exclude the possibility that the renewed Lease had a net positive value to Whyco of the type just described, as of August 5, 2008. In his

---

[31] Aff. of Joel Weingrad (Ex. E of Docket # 33) at ¶¶ 1-3.

March 20, 2008 letter to Sherwood's Joel Weingrad, quoted in part IV.A.1 of this opinion, Whyco Detroit's Nick Post took the position that the monthly rent amount in the Lease (which was scheduled to increase by $500.00 per month if the Lease automatically renewed effective February 1, 2009), was an above-market rate under the market conditions at that time. (If this was in fact the case as of August 5, 2008, that would suggest that as of that date the renewed Lease did *not* have a positive net market value.) In his March 24, 2008 e-mail reply to Nick Post's letter, quoted in part IV.A.1 of this opinion, Joel Weingrad said that he would send Whyco "a proposal with a rental rate less than your present monthly rental for any renewal periods," and that "[w]e want to be responsive to the prevailing rental market." But there is no evidence in the record about what proposed new rental rates the parties discussed after this exchange, or that the parties ever agreed to change to any particular new rental rate for the first renewal year of the Lease. And there is no evidence in the record of what the fair market rental rate was for the Premises, as of either August 5, 2008 or February 1, 2009.

For these reasons, and construing the summary judgment evidence presently in the record in the light most favorable to Sherwood, the Court cannot find that the renewed Lease had no positive net market value as of August 5, 2008. For this reason, a genuine issue of material fact exists as to whether Whyco received "reasonably equivalent value" for the automatic one-year renewal of the Lease.

In addition, there is a second level on which a genuine issue of fact exists, regarding Franklin's theory that Whyco received no benefit from the automatic one-year renewal of the Lease that occurred on August 5, 2008. The one-year renewal of the Lease gave Whyco the right to continue to occupy and use the Premises after January 31, 2009, which right Whyco could use

to allow its subsidiary Whyco Detroit to occupy and use the Premises, as Whyco had done during the initial five-year Lease term. This right, and Whyco Detroit's actual use of the Premises after January 31, 2009, if it occurred, may have benefitted Whyco's subsidiary economically. And that direct economic benefit to Whyco's subsidiary may have benefitted Whyco economically as well, indirectly. The evidence presented so far does not exclude the possibility that Whyco received such an indirect economic benefit, or show what the value was, to Whyco, of any such indirect economic benefit.

Under fraudulent transfer law, a parent company may be deemed to have benefitted, indirectly, from economic benefits that its subsidiary received. Sixth Circuit case law recognizes the possibility of such indirect economic benefit can be considered "value" received by the parent company for purposes of determining if the parent company received "reasonably equivalent value" in exchange for making a transfer or incurring an obligation. This Court discussed this concept at length, in *Gold v. Marquette University* (*In re Leonard*), 454 B.R. 444 (Bankr. E.D. Mich. 2011):

> The Bankruptcy Code does not define the phrase "reasonably equivalent value." But the Code defines "value," for purposes of § 548, as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but [it] does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A).
> . . .
>
> The Sixth Circuit discussed the § 548 concepts of "value" and "reasonably equivalent value" in *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 Fed.App'x. 337, No. 05-5744, 2006 WL 2380887 (6th Cir. Aug. 17, 2006). In *Lisle*, the court held that "[a] court considering [the question of "reasonably equivalent value"] should first determine whether the debtor received *any* value in the exchange. If so, the court should determine if the value received

23

was reasonably equivalent." 196 Fed.App'x. at 341 (emphasis in original)(citation omitted). The court further held that "[v]alue can be in the form of either a direct economic benefit or an indirect economic benefit." *Id.* at 342. The court discussed the situation in which the debtor/transferor does not receive a direct benefit in exchange for the transfer, but rather receives an "indirect" benefit, "through benefit to a third person." The court noted:

> "It is well settled that 'reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule.' " (citations omitted). The indirect benefit rule was first explained in *Rubin v. Manufacturers Hanover Trust Co.*:

> [A] debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person.... **[T]he transaction's benefit to the debtor need not be direct; it may come indirectly through benefit to a third person.... If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [the statute] has been satisfied-provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.**

661 F.2d 979, 991-92 (2d Cir.1981)(internal quotation marks and citations omitted).

*Id.* at 342 (bold emphasis added).

. . .

The *Lisle* case also involved an indirect benefit to the debtor/transferor. In *Lisle*, the bankruptcy debtor Wallace Wilkinson paid $1 million from his personal funds to John Wiley & Sons, Inc. ("Wiley"), a book publisher, for a shipment of books that Wiley sold to Wallace's Bookstore, Inc. ("WBI"). The debtor

24

Wilkinson was the majority shareholder of WBI. At the time of Wilkinson's $1 million transfer to Wiley, Wilkinson owed $60 million to WBI. WBI credited Wilkinson with a $1 million reduction in Wilkinson's debt to WBI. 196 Fed.App'x at 337-38, 342. Thus, in exchange for Wilkinson's $1 million payment to Wiley, the following benefits flowed: (1) a *direct* economic benefit flowing from Wiley to WBI, in the form of a shipment of books that Wiley sold to WBI; and (2) an *indirect* economic benefit flowing from WBI to the debtor Wilkinson, in the form of a $1 million credit against Wilkinson's debt to WBI. The Sixth Circuit characterized the latter benefit as "indirect," because "the benefit Wilkinson received did not come from Wiley," the transferee of Wilkinson's $1 million transfer, but rather from WBI. *Id.* at 342.

In *Lisle*, the Sixth Circuit held that when the benefit to the debtor/transferor is indirect, the fraudulent transfer defendant has the burden of showing that the indirect benefit to the debtor/transferor is "concrete and quantifiable," and has the burden of quantifying the benefit. *Id.* (citing cases, with approval). This burden can be difficult to meet in the case of an intangible, indirect benefit; as the *Lisle* court noted:

> The burden of showing that the benefit is concrete and quantifiable can be challenging in a case where the alleged benefit is goodwill, corporate synergy, a business opportunity, the continuation of a business relationship, or some other intangible benefit.

*Id.* (citations omitted). In the *Lisle* case, the court found that the indirect benefit to the debtor Wilkinson — a $1 million reduction in Wilkinson's debt to WBI — was concrete and quantifiable. *Id.*

Finally, the *Lisle* court held that whether the benefit to a debtor from a transfer is direct or indirect, it must be an "economic" benefit to the debtor in order to be considered "value." *Id.* ("Value can be in the form of either a direct economic benefit or an indirect economic benefit.") As the *Lisle* court held: "The district court rightly stated that 'the focus should be on the overall effect on the debtor's net worth after the transfer.'" *Id.* at 343 (citations omitted).

Thus, under the Sixth Circuit's decision in *Lisle*, an indirect benefit to the debtor from a transfer is not considered "value," and

therefore cannot be "reasonably equivalent value," unless it is (1) an "economic" benefit; (2) concrete; and (3) quantifiable.

454 B.R. at 455-57 (footnote omitted).

Bill Aikens's affidavit does allege, in a general, but inconclusive, way that Whyco never received any benefit from its subsidiary's use of the Premises, when it states:

> 9. From approximately February 1, 2004 to January 31, 2009, the Premises were occupied by Whyco Detroit.

> 10. The Debtor received no value from Whyco Detroit's occupation of the Premises because the Debtor did not occupy the Premises and Whyco Detroit never made payment, or provided any other benefit, to the Debtor on account of its occupation of the Premises or with respect to the Lease Agreement.
> . . .

> 25. The Debtor did not receive any value in exchange for the alleged extension of the Lease Agreement beyond January 31, 2009.

> 26. The Debtor did not receive any value in exchange for occupation of the Premises by any entity beyond the Petition Date.[32]

At this summary judgment stage, the Court must construe this evidence in the light most favorable to the non-moving party, Sherwood. In so doing, the Court concludes that this evidence is not enough to exclude, beyond any genuine issue of fact, the possibility that Whyco received indirect economic benefits from its subsidiary's use of the Premises. Bill Aikens's affidavit can reasonably be construed to mean only that Whyco Detroit did not pay Whyco rent, or pay Whyco money under some other guise, expressly for the use of the Premises. But this does not necessarily mean that Whyco Detroit's use of the Premises to conduct its business did

---

[32] Aff. of Bill Aikens (Ex. 5-A of Docket # 29) at ¶¶ 9-10, 25-26.

not indirectly benefit the parent company Whyco in a way that is cognizable under the Sixth

Circuit's decision in *Lisle*. Bill Aikens's affidavit makes no effort to analyze and address what

economic benefit, if any, Whyco received from the operations of its 100% subsidiary Whyco

Detroit.

For all of these reasons, genuine issues of material fact preclude the Court from granting

summary judgment to Franklin on its fraudulent transfer theory.

### D. Franklin's argument that if the Lease was automatically renewed effective February 1, 1999, then the Lease was rejected under 11 U.S.C. § 365(d)(4)

Franklin argues that if the Lease was automatically renewed for one year, beginning on

February 1, 1999, as Sherwood contends (and as the Court has now found, in part IV.A of this

opinion,) then the Lease must be deemed to have been rejected on April 7, 2009, under 11 U.S.C.

§ 365(d)(4).[33] Under that section, the Lease would be "deemed rejected" on the date that is 120

---

[33] Section 365(d)(4) provides:

> (4)(A) Subject to subparagraph (B), **an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of--**
>
> **(i) the date that is 120 days after the date of the order for relief**; or
>
> (ii) the date of the entry of an order confirming a plan.
>
> (B)(i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.
>
> (ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.
>
> (B)(i) The court may extend the period determined under subparagraph

days after the order for relief, because it is undisputed that the Debtor-in-Possession Whyco did not assume or reject the Lease by that date. Nor did the Court extend that 120-day deadline, before the deadline expired, as permitted by § 365(d)(4)(B)(i).

In this case, Whyco's voluntary Chapter 11 petition was filed on December 8, 2008, so that was the date of the order for relief, *see* 11 U.S.C. § 301(b), and day number 120 days after that was April 7, 2009. The Court agrees that the Lease must be deemed rejected, as of April 7, 2009, *unless* Franklin ultimately succeeds on either of its arguments that (1) Whyco assigned the Lease to Whyco Detroit and was relieved of all obligations under the Lease; and (2) the automatic renewal of the Lease for an additional year beginning February 1, 2009, is avoidable as a fraudulent obligation under 11 U.S.C. § 548.

Sherwood argues three things in response to Franklin's argument under § 365(d)(4). First, Sherwood argues that Whyco failed to "immediately surrender" the leased Premises to Sherwood, as it was required to do upon the deemed rejection under § 365(d)(4). Sherwood argues that because of this, the Lease "continued" after April 7, 2009, even if it was deemed rejected as of April 7, 2009.[34] There is a factual dispute about when Whyco and its subsidiary Whyco Detroit vacated the Premises, and thereby surrendered the Premises. But this issue

---

(A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

(ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

(Emphasis added).

[34] Sherwood Br. (Docket # 33) at 16.

28

cannot negate the fact that the Lease must be deemed rejected as of April 7, 2009.

Second, Sherwood argues that even if the Lease is deemed rejected as of April 7, 2009, it is still entitled to "contract damages for the remaining period of the Lease as part of its claim."[35] Under 11 U.S.C. §§ 365(g)(1), 501(d), and 502(g)(1), the April 7, 2009 (post-petition) rejection of the Lease is deemed to constitute a pre-petition breach of the Lease, and Sherwood would have a claim based on that breach that must be treated as a pre-petition claim.

Third, Sherwood argues that the Debtor's Chapter 11 plan, which was confirmed on March 22, 2010,[36] established a later, alternate date for the rejection of the Lease, such that the Lease was not rejected until the Effective Date of the Plan, which, Sherwood says, was March 27, 2010.[37] But the Court agrees with Franklin that the confirmed Plan could not, and did not purport to, establish a new, later rejection date for an unexpired lease that had been rejected 11 months earlier under 11 U.S.C. § 365(d)(4).[38]

---

[35] *Id.* at 17.

[36] *See supra* discussion in footnote 2 of this opinion.

[37] Sherwood Br. (Docket # 33) at 17. Actually, the Court calculates that the Effective Date of the confirmed Plan was April 12, 2010, because that is the date that was "five business days after the Confirmation Order becomes a Final Order." *See* Plan (Docket # 352) at 6 (definitions of "Effective Date" and "Final Order").

[38] Sherwood relies on Article IV(a) of the Plan, which states:

> On the Effective Date, all executory contracts **that exist** shall be rejected as of the Effective Date with no further action required by the Debtor, except for executory contracts and unexpired leases (i) that have previously been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (ii) are designated by the Committee as potentially to be assumed and assigned to a buyer; or (iii) have been assumed or designated to be assumed and assigned to the Buyer.

Docket # 352 at 14 (emphasis added). In the Court's view, this provision in the Plan cannot reasonably be read as applying to an unexpired lease that was deemed rejected under § 365(d)(4) many months

For these reasons, the Court concludes that the Lease was rejected, under 11 U.S.C.

§ 365(d)(4) effective April 7, 2009, subject to the following proviso.  Because of this proviso, the

Court cannot grant partial summary judgment in favor of Franklin on this rejection issue at this

time.  The proviso is that the Lease cannot be deemed rejected, as described above, if Franklin

prevails on either of the following claims: (1) Franklin's claim that the one-year automatic

renewal of the Lease, discussed in part IV.A of this opinion, is avoidable as a fraudulent

obligation under 11 U.S.C. § 548; and (2) Franklin's claim that the Lease was assigned to Whyco

Detroit and Whyco was relieved of any obligation under the Lease.  The Court has concluded that

genuine issues of material fact preclude summary judgment for Franklin on those claims, in parts

IV.B and IV.C of this opinion.  So those claims  remain pending.

### E. Franklin's argument that Sherwood's claim, both as originally filed and as later amended, should be disallowed because it was not timely filed

The general deadline for filing claims in this Chapter 11 case, set by the Court under

Fed.R.Bankr.P. 3003(c)(3) shortly after this case was filed, was April 13, 2009.[39]  Franklin argues

that Sherwood should have no allowed claim, because its original proof of claim, filed July 16,

2009 in the amount of $202,878.12,[40] and its amended proof of claim, filed April 21, 2010 in the

amount of $710,489.71,[41] were both untimely.  In the alternative, Franklin argues that even if the

Court excuses the allegedly untimely filing of Sherwood's initial proof of claim, the Court should

---

earlier, particularly in light of the fact that such a reading would make this provision in the Plan illegal,
as contrary to § 365(d)(4).

[39] Docket # 6 at 1.

[40] Docket # 29, Ex. 6-H.

[41] Docket # 29, Ex. 6-I.

not excuse the untimely filing of Sherwood's much larger amended proof of claim, and should not deem the amended claim to relate back to the date the initial claim was filed. For a number of reasons, Sherwood disputes Franklin's arguments.

The Court must deny Franklin's Motion, with respect to its arguments that Sherwood's claims were untimely. This result is necessary because of the rulings the Court has made on other summary judgment issues, earlier in this opinion. This is so because of the following:

1. The Court has ruled, earlier in this opinion, that the Lease was automatically renewed for the additional year beginning February 1, 2009, *unless* Franklin ultimately succeeds in avoiding the automatic renewal, as a constructively fraudulent obligation under 11 U.S.C. § 548(a)(1)(B), in which case the Lease would be deemed to have expired by its terms on January 31, 2009. And the Court has ruled that it cannot grant summary judgment for Franklin on its § 548 avoidance action.

2. If Franklin's avoidance action ultimately fails, so that the Lease was automatically renewed for the additional year beginning February 1, 2009, then the Lease must be deemed rejected as of April 7, 2009, under 11 U.S.C. § 365(d)(4), as the Court has ruled earlier in this opinion.

3. If the Lease was rejected on April 7, 2009, rather than simply having expired on January 31, 2009, then Sherwood had the right to file a claim "arising from the rejection," under 11 U.S.C. §§ 365(g)(1), 501(d), and 502(g)(1). And the deadline for filing such a claim, commonly referred to as a "rejection claim," was to be set by the Court, under Fed.R.Bankr.P. 3002(c)(4).

4.  The only deadline the Court ever set under Fed.R.Bankr.P. 3002(c)(4),[42] that would apply to a rejection claim of Sherwood, was ***May 12, 2010***.  This deadline was set by Article IV(b) of the confirmed Plan, which states:

> **Claims arising out of the rejection of an** executory contract or **unexpired lease must be filed with the Bankruptcy Court within thirty days after the later of**: (i) the date of entry of an order of the Bankruptcy Court approving such rejection; and (ii) **the Effective Date.**  Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of claim are not timely filed within that time period will be forever barred, unless otherwise ordered by the Bankruptcy Court.[43]

As noted in footnote 37 of this opinion, the Effective Date of the confirmed Plan was April 12, 2010.  So if the Lease was *rejected*, as described in Paragraph Nos. 2-3 above, the deadline for Sherwood to file a rejection claim (*i.e.*, any claim arising from the rejection of the Lease) was thirty days later, on ***May 12, 2010***.

5.  If, as just described, Sherwood had a right to file a rejection claim (because the Lease was rejected, rather than simply having expired on January 31, 2009), then to the extent Sherwood's originally-filed claim and its amended claim may be considered a claim "arising from the rejection" of the Lease, such claims were *timely* filed, because they were both filed before May 12, 2010.

6.  If the Lease was not rejected, then the May 12, 2010 claim-filing deadline does not

---

[42]  The Court set an earlier deadline for a list of five specific creditors whose executory contracts were rejected on motion of the Debtor, but that deadline applied only to those creditors, and not to Sherwood.  *See* Order, filed February 11, 2009 (Docket # 83 in Case No. 08-69940).

[43]  Plan (Docket # 352) at 14 (emphasis added).  In the Court's view, this Article IV(b) clearly applies to all rejected executory contracts and rejected unexpired leases, not just to those that were rejected only by virtue of Article IV(a) of the Plan.  *See also supra* discussion in footnote 38 of this opinion.  Franklin's counsel argued otherwise during the hearing on the motions (*see* Tr., Docket # 48, at 28-29), but the Court rejects that argument.

apply to Sherwood's claim at all.  Instead, the claim deadline was the general claims bar date of April 13, 2009.

7.  If and to the extent Sherwood is subject to the April 13, 2009 claim deadline in this case, Sherwood is entitled to an enlargement of that deadline, for some period of time after April 13, 2009, under Fed.R.Bankr.P. 9006(b)(1) for "excusable neglect," and possibly on other grounds, because, as described in part I.B.2 of this opinion, Sherwood was not given proper notice of the filing of the filing of this bankruptcy case and the claims-bar date.  The evidence currently in the record does not permit a finding that Sherwood learned of the bankruptcy case any sooner than April 23, 2009, ten days after the general claims bar date.

8.  If Sherwood is ultimately determined to have the benefit of the May 12, 2010 filing deadline for rejection claims, some of Sherwood's claim is likely to be considered a rejection claim (a claim "arising from the rejection of" the Lease), and some of the claim might not be considered a rejection claim.  In that event, some part(s) of Sherwood's claim (the rejection claim part(s)) would be deemed timely without further issue, but some part(s) of Sherwood's claim would be subject to the excusable neglect standard, to determine timeliness.  But even as to the latter, the Court's consideration of the relevant factors to determine "excusable neglect" may be materially affected by whether Sherwood has a rejection claim that is deemed timely because it was filed before May 12, 2010.  *See, e.g.*, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)(*e.g.*, the factors of "danger of prejudice" to the party opposing relief; and the "length of delay and its impact on judicial proceedings").

Based on these considerations, the Court cannot grant summary judgment at the present time, and on the current record, based on Franklin's arguments that Sherwood's claim should be

disallowed or reduced for untimeliness.

**F.  Franklin's other summary judgment arguments**

Franklin made several other arguments in its Motion.  But because of the Court's rulings in this opinion, above, and because genuine issues of material fact exist, the Court cannot grant summary judgment for Franklin based on any of the other arguments.

**V.  Conclusion**

For the reasons stated in this opinion, the Court will enter an order denying Franklin's Motion.

**Signed on October 18, 2013**                          /s/ **Thomas J. Tucker**
                                                        **Thomas J. Tucker**
                                                        **United States Bankruptcy Judge**

34